## RUSSEL COLEGROVE *v.* THE S. S. "CITY OF COLUMBIA."

APPEAL FROM CIRCUIT JUDGE PERRY, SITTING AS A COURT OF ADMIRALTY.

SUBMITTED DECEMBER 19 AND 20, 1898.     DECIDED MARCH 10, 1899.

JUDD, C.J., WHITING, J., AND CIRCUIT JUDGE STANLEY, IN PLACE OF FREAR, J., ABSENT.

A Circuit Judge of the Hawaiian Islands has jurisdiction in Admiralty, notwithstanding the annexation of these Islands to the United States.

The obligation resting on the master of a vessel at sea to maintain order and prevent the commission of crime, will, in a proper case, justify his arrest and detention of suspected persons. But the master, if a felony has been committed may not punish a passenger therefor, or one suspected of being accessory thereto. He may only confine the same, using no more harshness or force in the detention than is reasonably necessary, until investigation by the proper authorities.

OPINION OF THE COURT BY JUDD, C.J.

This is a libel in admiralty, by libellant *v.* the Steamship "City of Columbia." We have carefully examined the findings of fact and rulings of law made by the Circuit Judge of the First Circuit Court, from which appeals by both parties are taken, and adopt the same except as herein modified. The decision of the Circuit Judge is as follows:

"The libellant herein (Russel Colegrove) claims the sum of fifteen thousand dollars for an alleged malicious and unjusti-

fiable arrest and imprisonment of himself by the master on board of the American steamship 'City of Columbia,' now in the port of Honolulu, on the 4th, 5th and 6th days of September last while said vessel was on the high seas on a voyage from Seattle, Washington, to Honolulu, via Hilo, Hawaii, and also while in the harbor of Hilo. By way of aggravation it is further averred that the master used unnecessary force upon libellant in connection with said arrest and imprisonment, and that the place of confinement was unfit and improper for such purpose.

"Respondent in his answer admits the arrest and imprisonment, but says the same was reasonable, proper and necessary under the circumstances then existing and set up in said answer, and denies that any unnecessary force was used in effecting the imprisonment or that the place of confinement was unfit or improper for such purpose.

"Upon the evidence adduced I find the facts to be as follows: The steamship 'City of Columbia,' under command of Captain Milnor, the claimant herein, sailed from Seattle, Washington, on August 26th last, for Honolulu via Hilo, having on board a large number of first and second class passengers. Among the first class passengers were the libellant, his brother, B. H. Colegrove, and one Solomon Berliner with his wife and their daughter, Rose Berliner. About 6:30 o'clock on the evening of the 4th of September, the ship being then on the high seas, an altercation arose on deck between Solomon Berliner and B. H. Colegrove. After some words, the two clinched and in the course of the struggle that ensued B. H. Colegrove dealt Berliner a blow on the head with an iron belaying pin inflicting a very severe wound. One or two of the other passengers interfered at this stage and separated the combatants; libellant, who had not been present, also hurried to the scene and assisted in pulling his brother away from Berliner, urging him at the same time, 'For God's sake, keep quiet and cease fighting,' or words to that effect. In the interests of peace, libellant then conducted his brother to the bar room on the lower deck, while others, with the ship's surgeon, remained above to render such assistance as was possible to Berliner. A few minutes later the Captain entered the bar room where the brothers were, handcuffed B. H. Colegrove, conducted him aft along the starboard alleyway of the ship to the saloon, thence to the deck above, along the same on the port side and down the forecastle companion way to the entrance to the chain locker and then caused

him to be confined in said locker. Returning to the bar room either at once or a very short time later, the Captain handcuffed libellant, who submitted without offering any resistance, simply inquiring as to the cause of his arrest, and taking him by the same route followed in the case of his brother, had libellant also placed in the chain locker, handcuffed.

"The chain locker is a compartment in the forward part of the vessel, under the main deck, used for storing the anchor chains when the same are not out, and measures 6 feet 2 inches in length, 5 feet 10 inches in width and 8 feet in height from floor to ceiling. At the time of the events here referred to, there was considerable chain in the locker, so that the empty space between the top of the chain and the ceiling was only about 4 or 5 feet, except in one corner where a space of about 2 feet by 3 feet was clear from floor to ceiling. The walls of this compartment were built of closely joined two-inch boards, and the only openings into it were these: a hatchway above, 12 inches by 24 inches; an aperture on the port side, about 2 feet by 3 feet; a small opening leading to the oil room below; and two small holes, one on each side, through which the chains pass out to the anchors and large enough only for such purpose. Outside of the second opening here referred to, stood a number of bales of hay in such a position as to render the opening of but little value for purposes of ventilation. Thus very little fresh air could find its way into the chain locker; the ventilation was very poor, and such air as was within was warm and unpleasant; within the locker, it was dark.

"The two brothers having been put in the locker, an iron bar was placed across the small hatchway above in order to prevent their escape, and an unarmed guard was stationed near this hatchway with instructions to give the brothers all the water they needed, to attend to certain other wants of theirs, and to report to the Captain if anything else was asked or as occasion might otherwise require.

"About eight or nine o'clock that evening, the brothers asked that their coats be removed on account of the great heat in the locker. The Captain, upon being informed of the request, ordered the first mate to remove the handcuffs so as to enable the men to take off their coats, and then to put the handcuffs on again. The mate did as ordered as to libellant, but in attempting to unlock the handcuffs on B. H. Colegrove's wrists, the key was broken. This fact being reported to the Master, the latter inquired of the first mate if there was any file on

board with which the handcuffs could be cut. The mate replied that there was not, and until arrival at Hilo no further attempt was made to remove the handcuffs. Had he been able to do so I believe the Captain would have removed the handcuffs either at some time during that night or when the libellant was taken out of the locker.

"Libellant and his brother remained in the locker until about eight o'clock the following morning, when they were taken out by order of the Captain and confined in one of the second class staterooms. During the night they asked for and obtained ice water a number of times, and were taken out once or twice to answer a call of nature. About midnight a friend on board brought them blankets to lie on. B. H. Colegrove, being in good health suffered no great inconvenience by reason of his detention in the locker; libellant, on the other hand, had overworked himself just prior to this voyage and was in somewhat nervous and poor state of health, and consequently was unable to bear the confinement as well and suffered on account of the lack of proper ventilation and of the heat. The degree of his suffering has, however, as I believe, been greatly exaggerated by the libellant both in his libel and in the testimony on the stand. The averment of permanent injury to health is unsupported by any evidence.

"When taken out of the locker, libellant was in a semi-unconscious condition due to his confinement and had to be assisted to the stateroom. The surgeon attended upon him and the Captain gave orders that libellant be furnished anything he might desire in the line of food. It was some time—just how long is not clearly shown by the evidence—before libellant fully recovered consciousness. The remainder of that day, Monday, and also on Tuesday until the ship anchored in Hilo bay and thereafter for two or three hours until the American Consul came aboard to conduct an investigation, the two brothers were confined in the second class stateroom already mentioned. The door of this room was kept closed and a guard placed on duty, outside.

"Whether or not the blinds were kept closed for a part of the time as claimed by libellant, my finding is that the room was fairly well ventilated and comfortable, and that while confined therein libellant suffered no discomfort except that which was caused by his previous confinement in the chain locker and by the fact of his being handcuffed; while there, he was regularly furnished with proper food.

"Upon arrival at Hilo, on the morning of Tuesday, the 6th of September, the Captain went ashore, and reported to the American Consul the occurrences of the voyage. He at the same time procured from the chief of police a key with which to unlock the handcuffs on the two brothers. In consequence of the information received, the Consul went aboard and there held an investigation. What the findings of the Consul were, the evidence in this case does not show, further than that he did not peremptorily order the Captain to release the men. During the course of the investigation the handcuffs were removed, and at the conclusion of the proceedings, libellant and his brother were released from custody and thereafter were accorded the full privileges of passengers.

"It is necessary now to consider, on the subject of justification, a few facts occurring prior to the assault on Berliner. From the beginning of the voyage, libellant paid marked attentions to Rose Berliner, her father and mother apparently consenting thereto, and continued to do so until about the third or fourth day out when the first trouble between Berliner and libellant occurred. Libellant was seated on deck with Rose and her mother, when Berliner approached and in the course of a short conversation which followed charged by insinuation that libellant's intentions towards his daughter were dishonorable. Mrs. Berliner took part in the quarrel, against her husband, and said in a loud tone, *inter alia*, that Berliner was not the father of Rose, and that she could point out to him if he wanted her to, the girl's real father. Libellant seized a chair and was about to strike Berliner with it when he was held back by Rose and prevented from doing so. Libellant then went to the bar room below in order to avoid any further scene on deck, and said to his brother, who was there at the time, 'Berliner has insulted me.' At this moment, Berliner, who had followed libellant, appeared. B. H. Colegrove, the possessor, as shown by the evidence, of an ungovernable temper, at once arose and, referring to the insult offered his brother, slapped or struck Berliner in the face. Berliner left and reported to the Captain that 'the two Colegroves' had struck him and exhibited bruises or discolorations in his face. The Captain then went with Berliner to the bar-room and addressing the two brothers said to them, 'this man says that you two have assaulted him.' Neither of them denied the accusation. Berliner asked libellant to desist from his attentions to Rose and libellant said he would do so. B. H. Colegrove then attempted to make another assault

on Berliner, but was seized by the Captain and prevented from doing so. Libellant; while his brother was making the attempt, called out to him, in the presence of the Captain, to 'keep quiet' and not 'to fight any more' with Berliner, or words to that effect. The Captain, having warned the parties that these scenes must stop and that he could not permit such unseemly conduct on board of his ship, left the room.

"The Captain had knowledge of the facts with reference to the scene on deck above referred to, and was asked by Berliner to interfere but declined to do so on the ground that it was only a family affair. Both before and after these incidents, the last time being about two hours before the assault of the Sunday night, Berliner had on several occasions sought the Captain and demanded of him protection against the two Colegroves and also against his wife.

"After the arrest of B. H. Colegrove, but before the arrest of libellant, one of the passengers, Lee by name, said to the Captain that he should arrest Russel Colegrove too and then stated, in substance: 'Russel Colegrove was sitting back there with those two women' (meaning Mrs. Berliner and her daughter); 'I saw Will Colegrove' (B. H. Colegrove) 'come up and say something to them.' Mrs. Berliner said, 'Yes, give him hell.' The women and Russel Colegrove then walked to the stern of the ship, and Will Colegrove went up to Solomon Berliner and the fight followed.'

"For a few moments after the assault on the Sunday evening it was thought by the surgeon and by the passengers that Berliner had been killed, but this was soon found not to be so, and the surgeon then announced as his opinion that the wounded man could not possibly recover. At this time there was great excitement and indignation among the passengers. Some of them talked of lynching or hanging the man that did it; three or four were heard to say 'I wouldn't mind pulling on the rope myself,' while still another or others said 'the whole lot (meaning Mrs. Berliner and daughter and the two Colegroves) 'ought to be locked up.' The threats or murmurings of violence were all directed against B. H. Colegrove only; at no time was libellant in danger of being lynched, for it was generally believed among the passengers that he had taken no part in the serious assault.

"About an hour after the assault, the surgeon gave it as his opinion that Berliner had 'a fighting chance' for life, and it was not until the next morning at about eight o'clock that he con-

sidered the patient out of danger and so stated. After that Berliner seemed to recover rapidly and in the evening of Monday was already walking about, with a bandage around his head.

"I find from the evidence that the libellant did not in fact instigate or incite the commission of the assault by his brother upon Berliner and that he was not guilty of being an accessory before the fact to such offense, but I also find that all of the difficulties between Berliner and B. H. Colegrove grew out of libellant's conduct with reference to Rose Berliner. B. H. Colegrove had no personal grievance of his own against Berliner. Under all the circumstances of the case at the time as known by and reported to the Captain, I believe that the Captain, in order to ensure peace on board and in order to obtain for his other passengers that freedom to which they were entitled from such scenes as had marred the pleasure of the voyage up to that time, would have been justified in confining libellant in his own stateroom, or in the second class stateroom, or in any other reasonable and proper place of confinement, and in detaining him in such confinement until, at least, arrival in Hilo; and even if the Captain had reasonable cause to believe that the libellant was guilty of being an accessory before the fact to the offense committed, he could go no further than to simply confine and detain him pending an investigation by the proper authorities, still continuing to treat him as a passenger and making the imprisonment no more harsh and using no more force than was reasonably necessary for the purpose of detention. He could do nothing by way of inflicting punishment. I am further of the opinion that, bearing in mind these limitations upon the master's authority, the imprisonment of libellant in the chain locker was unnecessarily harsh and that the placing him in irons was unjustifiable. The defense that the chain locker was selected as a place of confinement for libellant because it was necessary to do so in order to protect him from violence at the hands of the other passengers, has not been established to my satisfaction. I cannot find upon the evidence that the Captain had at the time any reasonable cause for believing that the passengers would do or attempt to do any violence to the libellant.

"Whether or not the imprisonment of B. H. Colegrove, handcuffed, in the chain locker was justifiable under the circumstances, need not now be decided.

"A strenuous effort has been made on behalf of the libellant to show that the master in his conduct towards libellant was act-

uated by ill-will—actual malice—but the evidence does not prove this to my satisfaction. I do, however, find upon the evidence that the Captain, in handcuffing the libellant and in confining him in the chain locker, acted with a reckless disregard of the rights of the libellant.

"Much testimony was given at the trial and much argument made on a number of matters to which I have not here referred. Those matters were of value largely, if not entirely, on the question of actual malice on the part of the master and of credibility of the witnesses. It seems to me that while all of those matters have been carefully considered by me, it is not essential to refer to them in detail, and that to do so would be to unnecessarily lengthen this decision.

"Under all the circumstances of this case, I pronounce in favor of the libellant for the sum of One Thousand Dollars and costs.

"Decree accordingly."

We wish to add that as regards the alleged malice of the master against libellant as a foundation for punitive damages against the master's employer, the owners of the steamship, the law, if private malice be found, laid down by this Court, is as follows:

"For a wilful and malicious trespass of a servant, not commanded or ratified by the master, but perpetrated to gratify the private malice of the servant under mere color of discharging the duty which he has undertaken for his master, no action will lie against the master. But if the act of the servant was necessary to accomplish the purpose of his employment, and was intended for that purpose, however ill advised or improper, then it was implied in the employment and the master is liable, though the servant may have executed it wilfully and maliciously. These rules apply to corporations as to private individuals."

*Duncan v. Wilder's Steamship Co.* 8 Hawn. 411-414.

We overrule the plea to the jurisdiction. The question has, since the argument in this case, been decided by this Court, adversely to the plea, in the matter of the petition of *Ah Ho and others*, page 654, *ante*.

Upon the whole case we think the damages assessed by the

Circuit Judge were not sufficient. The confinement of the libellant in the "chain locker" and continuing him in irons, which the evidence shows could easily have been removed, were totally unnecessary.

We fix the damages at ($2,500) Two Thousand Five Hundred Dollars.

*Kinney, Ballou & McClanahan* for libellant.

*F. M. Hatch* and *E. Caypless* for respondent.